**In re TEXACO INC., Texaco Capital Inc., Texaco Capital N.V., Debtors.**

Bankruptcy Nos. 87 B 20142, 87 B 20143 and 87 B 20144.

United States Bankruptcy Court, S.D. New York.

Oct. 30, 1987.

Levin & Weintraub & Crames, New York City, and Stutman, Treister & Glatt, P.C., Los Angeles, Cal., Baker & Botts, Houston, Tex., co-counsels, for Pennzoil Co.

Weil, Gotshal & Manges, New York City, for debtors.

Kramer, Levin, Nessen, Kamin & Frankel, New York City, for General Committee.

Cleary, Gottlieb, Steen & Hamilton, New York City, for Industry Committee.

Keck, Mahin & Cate, Chicago, Ill., for Equity Committee.

## DECISION ON MOTION FOR RULE 2004 EXAMINATIONS

HOWARD SCHWARTZBERG, Bankruptcy Judge.

On September 11, 1987, Pennzoil Company ("Pennzoil"), the largest unsecured creditor in these administratively consolidated Chapter 11 cases, filed its motion for an order pursuant to Bankruptcy Rule 2004 and 11 U.S.C. § 105(a) of the Bankruptcy Code directing the debtor Texaco Inc. ("Texaco") to produce a broad range of documents for examination and copying. The Pennzoil motion also seeks an order directing certain top officers and employees of Texaco to appear for examination upon oral deposition.

Pursuant to a motion dated September 17, 1987, Texaco moved for an order adjourning Pennzoil's motion so that Texaco could have adequate time to prepare and file its response to Pennzoil's motion. Pennzoil's motion was adjourned to October 6, 1987 and thereafter to October 28, 1987, the hearing date. The adjournments were made in order to await Texaco's production of documents requested by the Committee of Industry Unsecured Creditors (the "Industry Committee").

By a notice dated September 30, 1987, Pennzoil sought a supplemental production of documents from Texaco in accordance with Bankruptcy Rule 7034, which incorporated Rule 34 of the Federal Rules of Civil Procedure. Pennzoil agreed that there would be no discovery efforts during the adjournment of the hearing with respect to its Rule 2004 motion.

Pursuant to a motion dated October 16, 1987, Texaco moved to take the depositions of nine individuals, including two of Pennzoil's financial advisors and two of Pennzoil's attorneys in these cases. Additionally, Texaco requested that each of the proposed deponents produce a vast quantity of documents concerning Texaco's affairs which related to many of the same subjects which were covered in Pennzoil's production request. Texaco contends that its discovery request is directed at developing evidence to prove that Pennzoil's motive in pursuing its Rule 2004 motion is to harass and pressure Texaco in order to compel Texaco to accept Pennzoil's disputed judgment claim.

Texaco Inc. and two of its wholly-owned subsidiaries, Texaco Capital Inc. and Texaco Capital N.V., are debtors in possession as a result of their each having filed Chapter 11 cases in this court on April 12, 1987. On the same day, the court entered an order directing that the Chapter 11 case be jointly administered pursuant to Bankruptcy Rule 1015(b). Texaco and its two subsidiaries are operating their businesses and managing their properties as debtors in possession in accordance with 11 U.S.C. §§ 1107 and 1108 of the Bankruptcy Code.

## PENNZOIL'S MOTION

As a judgment creditor holding the largest unsecured claim against Texaco, Pennzoil's claim, as defined in 11 U.S.C. § 101(4), gives Pennzoil the status of a creditor within the meaning of 11 U.S.C. § 101(9)(A). A creditor is clearly a party in interest, as expressed in 11 U.S.C. § 1109(b). Accordingly, as a party in interest, Pennzoil is entitled to seek a Rule 2004 examination of the debtor, Texaco Inc. The scope of this examination is stated in subsection (b) of Rule 2004 to relate "to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate ...". Additionally, in a Chapter 11 case, the examination "may also relate to the operation of

any business and ... any other matter relevant ... to the formulation of a plan."

At this juncture in these cases, Pennzoil has had the benefit of the financial information that Texaco has supplied to the Industry Committee, in view of the fact that Pennzoil is a member of and has a representative serving as co-chairman of that committee. Both the Industry Committee and the General Unsecured Creditors' Committee indicated at the hearing that they are now satisfied with the flow of information they are receiving from Texaco and, therefore, do not join in Pennzoil's motion. However, Pennzoil's interests are not identical with those of the other members of the Industry Committee because its exposure is greater. Not only is Pennzoil's claim the largest one in these cases, but unlike the other members of its committee, Pennzoil's judgment claim is heatedly disputed by Texaco. Hence, Pennzoil reasons that it needs more information about Texaco's finances than other Committee members in order to protect its position.

■ Rule 2004 affords a party in interest an opportunity to conduct a wide-ranging examination with respect to a debtor's financial affairs. *In re Johns–Manville Corp.*, 42 B.R. 362 (Bankr.S.D.N.Y.1984); *In re Silverman*, 36 B.R. 254 (Bankr.S.D. N.Y.1984); *In re Frigitemp*, 15 B.R. 263 (Bankr.S.D.N.Y.1981). However, the scope of the examination is not limitless; the examination should not be so broad as to be more disruptive and costly to the debtor than beneficial to the creditor. In light of the fact that Texaco is furnishing financial information to the General Unsecured Creditors' Committee, the Industry Committee, the Shareholders' Committee and to the accountants for these Committees, and that Texaco will also be required to furnish information to investment advisors who have recently been authorized to be retained by these Committees, it follows that Pennzoil's requested examination should not encompass matters that will be unduly burdensome to the debtor and duplicative of previously furnished information or will not be required in order to evaluate or propose a plan of reorganization.

For purposes of document production, Pennzoil has broadly defined the word "document" to mean:

... the original (and any copy of the original which contains additional writing thereon or attached thereto) of memoranda, reports, books, manuals, instructions, financial reports, working papers, drafts, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospecti, interoffice and intraoffice communications, contracts, cables, notations of any sort of conversation, telephone calls, meetings or other communications, bulletins, printed matter, computer printouts, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimate, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies, investigations, questionnaires, surveys, work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes or amendments of any of the foregoing), graphic or oral records or representations of any kind (including, without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), electronic, mechanical and electric records or representations of any kind (including, without limitation, tapes, cassettes, discs and recordings) and other written, printed, typed or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, phonorecord, film, audio tape or videotape.

■ Pennzoil's definition of the word "document" is obviously too broad and borders on the ridiculous. For purposes of the examination, the word "document" shall mean financial or other reports, contracts, records and minutes.

The documents sought by Pennzoil are described in ten broad categories in a Schedule A annexed to the notice. A copy of Schedule A is set forth as an appendix to this opinion. The requests are directed to Texaco and its subsidiaries and affiliates,

all but two of which are not debtors in these cases. The examination shall be limited only to those three corporations which are debtors in these Chapter 11 cases.

In Category I, document production shall include:

1. Annual Financial Statements for the period from January 1, 1983 through December 31, 1986;

2. Quarterly Financial Statements for the quarters ending March 31, 1987 and June 30, 1987;

3. 8–K, 10K and 10Q filings with the Securities & Exchange Commission ("SEC") for the period from January 1, 1983 to the present;

4. All other filings with the SEC from January 1, 1983 to the present;

\* \* \* \* \* \*

8. Documents reflecting, effecting or relating to, between January 1, 198[5] and the present, (a) the acquisition or divestiture of assets of any kind (other than purchases or sales in the ordinary course of business at market prices of produced petroleum or natural gas or derived therefrom) where the value of the assets acquired or divested in an individual transaction exceeded $15,-000,000; and (b) the valuation of assets described in 8(a) above for purposes of acquisition or divestiture or otherwise;

\* \* \* \* \* \*

10. Tax Returns or other filings made with United States federal agencies for or during the years 1984, 1985, and 1986;

11. Analyses of the current and deferred income tax provision and liability accounts for the years 1985 through 1987;

12. Business Plans for present and future periods, including without limitation (a) 1987 Profit Plan, as well as plans for future years;

\* \* \* \* \* \*

14. Cash Flow from January 1, 198[5] to the present, including without limitation (a) Cash Flow Projections through 1989, and (b) Capital Budgets;

15. Loan Agreements, indentures, leases, guarantees, "take-or-pay" contracts, "through-put" agreements or other financing instruments outstanding at anytime from November 1, 1985 to the present;

16. Documents relating to proposed financing with Chemical Bank as Agent including without limitation any commitment fees relating thereto;

17. 1985 Accounts Receivable Agreement with Manufacturers Hanover, as Agent;

18. 1986 Bank Revolving Credit Agreement;

19. Documents reflecting dividends and other distributions paid by Texaco to capital stockholders, and purchases or redemptions of capital stock, made by Texaco, in each case during the period April 12, 198[5] to the present.

Category II, dealing with intercompany practices with regard to dividends, advances, funds or transfers of products from January 1, 1983 to the present, shall be deleted. *See In re Unishops, Inc.,* 494 F.2d 689 (2d Cir.1974); *In re Beck Industries, Inc.,* 479 F.2d 410 (2d Cir.1973), *cert. den.* 414 U.S. 858, 94 S.Ct. 163, 38 L.Ed.2d 108 (1973).

Category III, which relates to the value of oil and gas interests owned by Texaco, may be satisfied through the efforts of an independent organization skilled in evaluating oil and gas reserves. Pennzoil stated at the hearing that it was prepared to designate such an organization and to pay for the cost of obtaining this information. Accordingly, Texaco shall cooperate with such independent organization designated by Pennzoil for this purpose.

Category V requests documents reflecting the organizational structure of Texaco and its two subsidiary debtors, from January 1, 1984 to the present. Texaco shall produce the documents requested as to the parent corporation and its two subsidiary debtor corporations.

Category VI calls for the production of documents relating to litigation matters in

which Texaco is currently involved where the amount in controversy exceeds $100,000,000. Texaco shall produce the requested documents.

Category VII calls for the production of documents which reflect Texaco's relationships with shareholders, creditors, officers and directors from January 1, 1984 to the present. Texaco shall produce documents during this period, respecting officers and directors only, as follows:

1. Listing all accounts, notes and other obligations payable to and receivable from officers and directors of any of the debtor corporations.

2. Liability insurance policies relating to any director or officer of the debtor corporations in their capacity as either an officer or a director.

Category VIII seeks documents with respect to certain sales, transfers and transactions from January 1, 1983. Texaco shall produce the documents with respect to the following matters:

1. The sale or transfer of Texaco's Port Arthur refinery;

2. The sale or transfer of Texaco Canada stock;

3. The sale or transfer of Louisiana timberland (approximately 112,000 acres);

Additionally, Texaco shall produce documents with respect to the following matters:

*    *    *    *    *    *

7. Texaco's post-petition payments in excess of $50,000 to persons or entities in discharge of pre-petition indebtedness not heretofore specifically approved by the bankruptcy court;

8. Purchase or renewal of director and officer insurance.

Category IX calls for the production of documents relating to the development, preparation or content of restructuring of Texaco's operations or a plan of reorganization for Texaco. The first items relate to any proposed reorganization plan that Texaco may present. This information will have to await the presentation of the adequate information required for the court's

approval of a disclosure statement required of the debtor pursuant to 11 U.S.C. § 1125. Pennzoil's quest for this information is premature.

Texaco shall produce documents with respect to the following:

*    *    *    *    *    *

5. Texaco presentations regarding reorganization or restructuring of Texaco made to shareholders, employees or directors from November 1, 1985 to the present (including audio or video tapes of such presentations, *e.g.* Texaco Video News Service).

6. Valuation of stock of Texaco subsidiaries.

Category X calls for documents prepared from and after January 1, 1984, relating to the value in connection with a corporate restructuring or reorganization, market value, fair market value, appraised value, sales value or liquidation value of Texaco's component parts and Texaco as a whole:

1. Preliminary, draft and final reports, appraisals or analyses prepared by investment bankers, investment advisors or appraisers;

2. Preliminary, draft and final reports, appraisals or analyses prepared by the financial staff, planning staff or Treasury department of Texaco or its subsidiaries or affiliates.

Information as to the foregoing items is relevant and should be produced, but limited to the period commencing with January 1, 1986.

All of the documents which are to be produced by Texaco shall be made available to Pennzoil at Texaco's Offices in Westchester County, for copying by Pennzoil's representatives at Pennzoil's expense.

Pennzoil also requests that one or more of Texaco's officers or employees shall appear at the offices of Pennzoil's counsel for examination by oral deposition between 15 and 20 days after Texaco's production of documents for the purpose of determining compliance with the document production. Additionally, Pennzoil requests that eight (8) named individuals appear at the offices of its counsel for examination between 30

and 45 days after the document production. Included on this list is Texaco's Chairman, chief executive officer, chief financial officer, general counsel, deputy treasurer, deputy general counsel, a senior vice president, a vice president and senior vice president of Texaco USA (a division of Texaco). Pennzoil also reserves the right to examine additional officers, directors, employees, managing agents or other persons with knowledge of the subject matter contained in the documents to be produced.

Pennzoil's proposed oral examinations of so many of Texaco's top officers can become overly burdensome, disruptive of the debtor's operations and vexatious. Therefore, Pennzoil shall be content with examining separately James W. Kinnear, Alfred C. DeCrane, Jr. and Richard G. Brinkman, at such time and place as the parties shall mutually agree, after Texaco has completed the production of the documents required in accordance with this court's ruling.

In view of the fact that this court has permitted Pennzoil to obtain certain documents from Texaco and to take the depositions of specific executives of Texaco, it follows that Texaco's motion to develop evidence to demonstrate that Pennzoil's Rule 2004 motion was made in bad faith, is now academic. The scope of Pennzoil's Rule 2004 motion and examination request has been reduced to a range which should satisfy the concept of a good faith inquiry, considering the size and complexity of these consolidated Chapter 11 cases. Accordingly, Texaco's discovery motion is denied as moot.

SETTLE ORDER, on notice, in accordance with the foregoing.

### APPENDIX A

### SCHEDULE A

This Schedule categorizes and identifies the documents which are to be produced by Texaco Inc., ("Texaco" or the "Debtor"), pursuant to Pennzoil Company's Motion for Rule 2004 Examinations.[1]

### Category I.

Documents which reflect the past, present or future consolidated and/or consolidating financial condition of Texaco, including subsidiaries and affiliates of Texaco which have not filed chapter 11 petitions ("non-filing affiliates" or "NFAs"), from and after January 1, 1983 (unless otherwise indicated), including specifically without limitation:

1. Annual Financial Statements for the period from January 1, 1983 through December 31, 1986;

2. Quarterly Financial Statements for the quarters ending March 31, 1987 and June 30, 1987;

3. 8-K, 10K and 10Q filings with the Securities & Exchange Commission ("SEC") for the period from January 1, 1983 to the present;

4. All other filings with the SEC from January 1, 1983 to the present;

5. Accounts Payable listings, including aging thereof, produced during 1987;

6. Accounts Receivable listings, including aging thereof, produced during 1987;

7. List of notes or other obligations payable or receivable at any time, outstanding during the period November 1, 1985 to the present;

8. Documents reflecting, effecting or relating to, between January 1, 1983 and the present,

(a) the acquisition or divestiture of assets of any kind (other than purchases or sales in the ordinary course of business at market prices of produced petroleum or natural gas or products derived therefrom) where the value of the assets acquired or divested in an individual transaction exceeded $15,000,000; and

(b) the valuation of assets described in 8(a) above for purposes of acquisition or divestiture or otherwise;

---

1. The definition of "document" found at paragraph 8 in Pennzoil's Motion for Rule 2004 Examinations is incorporated herein by reference. For example, where Category I Paragraph 12 requests Business Plans, Texaco should produce not only final Business Plans, but also all drafts, working papers and notes made in connection therewith.

9. Analyses of Deferred Credits from January 1, 1984 to the present;

10. Tax Returns or other filings made with United States federal agencies for or during the years 1984, 1985, and 1986;

11. Analyses of the current and deferred income tax provision and liability accounts for the years 1985 through 1987;

12. Business Plans for present and future periods, including without limitation

(a) 1987 Profit Plan, as well as plans for future years;

(b) Business Strategic Plans from January 1, 1983 to the present, as well as Plans for future years;

13. Documents relating to employee compensation as follows:

(a) W-2 information for each of those employees for each year 1983 to the present, who were among the 250 most highly compensated employees for any such years;

(b) Salary and compensation budgets and history for each year from 1983 to the present for each company or operating division thereof; and

(c) Job title and description for each individual identified in 13(a);

14. Cash Flow from January 1, 1983 to the present, including without limitation

(a) Cash Flow Projections through 1989, and

(b) Capital Budgets;

15. Loan Agreements, indentures, leases, guarantees, "take-or-pay" contracts, "through-put" agreements or other financing instruments outstanding at anytime from November 1, 1985 to the present;

16. Documents relating to proposed financing with Chemical Bank as Agent including without limitation any commitment fees relating thereto;

17. 1985 Accounts Receivable Agreement with Manufacturers Hanover, as Agent;

18. 1986 Bank Revolving Credit Agreement;

19. Documents reflecting dividends and other distributions paid by Texaco to capital stockholders, and purchases or redemptions of capital stock, made by Texaco, in each case during the period April 12, 1981, to the present.

### Category II.

Documents which reflect the debtor's "intracompany" or "intercompany" (hereinafter collectively "intercompany") practices, i.e., practices among or between Texaco and its affiliates with regard to dividends, advances, funds or transfers of products from January 1, 1983 to the present (unless otherwise indicated), including without limitation:

1. Records relating to intercompany accounts at March 31, 1987, April 12, 1987 and June 30, 1987 (or as near to such dates as are extant);

2. Records of intercompany transfers (*e.g.*, schedules of transfers, copies of drafts, wire transfers, or book entries);

3. Documents reflecting peak cash needs or projections of intercompany transfers;

4. Documents reflecting or effecting intercompany dividend payments;

5. Documents showing the detail and support of blocked or restricted funds, *e.g.*, funds prohibited from transfer from foreign countries because of legal or other restrictions or from companies because of contractual restrictions, or funds subject to accounts in financial institutions to which Texaco does not have unrestricted access;

6. Documents relating to or reflecting any intercompany oral or written agreements regarding fund transfers, dividends, advances, or related interest allocations;

7. Documents relating to reserve treatment or requirements or other obligations to retain funds, *e.g.*, the Heddington Insurance Limited agreement relating to retention of reserves.

### Category III.

Documents which relate to properties formerly owned by Getty Oil Company and its subsidiaries ("Getty"), including without limitation:

1. Cash flows from December 31, 1983 to the present generated by oil and gas properties and reserves and by other lines of business owned by Getty or owned by Getty prior to its acquisition by Texaco ("Getty Reserves");
2. Supplemental Oil and Gas Information presented in accordance with FASB 69, Disclosures About Oil and Gas Producing Activities, for Getty oil and gas properties for and from the years ending December 31, 1983, to the present.
3. Engineering reports on Getty Reserves for and from the years ending December 31, 1983 to the present;
4. Documents relating to Texaco's divestiture of Getty subsidiaries, affiliates, or assets from January 1, 1984 to the present.

### Category IV.

The specific documents requested below which reflect the volumes and values of the crude oil, condensate, natural gas liquids and natural gas reserves attributable to Texaco and its NFA's, and those documents which reflect values and other information for fee, leasehold acreage or other mineral interests that have not been established as productive of hydrocarbons, all for the period January 1, 1983 to the present and any projections for future periods.

1. For properties which have been established as productive of hydrocarbons, all documents consisting of or referring to economic studies, evaluations, analyses or reports, or other studies, evaluations, or reports relating to all or any portion of the properties. At this time, this request includes only the documents described below.

(a) Listings for each productive property showing for each category (proved, probable, possible or other) of reserves at the most two recent common referenced dates, the remaining volumes, the present value of future total net cash flows (total revenues attributable to Texaco minus royalties, operating costs, production, severance, and ad valorem taxes, minus any other revenue sharing or other obligations to foreign governments, minus estimated abandonment costs and minus future capital expenditures required to recover the reserves), and the future total net cash flows discounted at a stated annual rate. The information sought is that based on premises of future sales prices, operating and investment costs changes, rather than that requested in (c) below, which is based on constant prices and costs. The source of the estimates should be identified (Texaco or a named outside source), and sufficient information concerning the sales prices, operating and investment cost premises which were employed for a given property or group of properties should be described to provide an understanding of those factors.

(b) The calculation summary for each individual property supporting each of the two listings requested in paragraph (a) above, showing the detailed forecast of future annual production rates, sales prices, operating costs, local taxes and capital investments. The source of each summary should be identified (Texaco or a named outside source).

(c) Summaries and work or data sheets similar to the information requested in paragraphs (a) and (b) above employed to prepare for each annual period from January 1, 1983 to the present the standardized measure of discounted future net cash flows and the estimated net proved developed and undeveloped reserves of crude oil, natural gas liquids and natural gas disclosed in Supplemental Oil and Gas Information presented in accordance with FASB 69, Disclosures About Oil and Gas Producing Activities contained in Getty and Texaco annual reports and Forms 10–K filed with the Securities and Exchange Commission.

(d) Reports or analyses prepared directly or indirectly at the request of Texaco or Getty by advisors, consul-

tants or others who are not employees of Texaco or Getty containing evaluations of the oil and gas producing properties of Texaco and Getty or any part thereof.

2. For properties which have not been established as productive of hydrocarbons, all documents prepared from January 1, 1983 to the present and consisting of or referring to Texaco's and Getty's fee and leasehold acreage holdings and/or valuation by cost or otherwise, of such fee, leasehold acreage, or other mineral interests, including but not limited to any breakdowns by geographical unit, geological province, federal and non-federal, developed and undeveloped, and/or fee, leasehold acreage, or other mineral interests. This request includes any summary computer printouts of such properties, and such summaries may be offered in lieu of the lease instruments themselves provided the summaries reflect information regarding the acquisition and expiration dates of each property, the bonus paid, acreage, rental terms, royalty provisions, geological and geophysical expenditures thereon, and locations of the properties. This request further includes any reports or analyses prepared by Texaco or Getty employees or by advisors, consultants or others who are not employees of Getty or Texaco containing evaluations of such Getty and Texaco nonproductive properties or any part thereof.

### Category V.

Documents which reflect the organizational structure of Texaco and its affiliates from January 1, 1984 to the present, including without limitation:

1. Detailed organizational charts, lists or documents for Texaco and its affiliates, subsidiaries, and companies showing the ownership or investments in all entities and showing the officers, directors, managing agents and similar representatives thereof;

2. Organizational documents including articles of incorporation, by-laws, and similar instruments for Texaco, Texaco Capital Inc., Texaco Capital N.V., and the NFA's;

3. Minutes or notes of meetings of the Board of Directors, Committees or Subcommittees thereof, or any other person, group or entity which discharges similar functions for the period from December 1985 until the present for:

(a) Texaco,

(b) Texaco Capital Inc.,

(c) Texaco Capital N.V., and

(d) NFAs.

### Category VI.

Documents relating to litigation matters in which Texaco is currently involved where the amount in controversy exceeds $100,000,000 (including without limitation litigation involving the Department of Energy, State of California, California Antitrust claims, State of Louisiana and shareholder derivative and class actions), including without limitation:

1. Original, amended and supplemental complaints or petitions;

2. Original, amended and supplemental answers;

3. Judgments;

4. Demand letters;

5. Evaluations or analyses of claims or settlements (whether considered or actually offered or proposed).

### Category VII.

Documents which reflect the Debtor's relationships with shareholders, creditors, officers, directors from January 1, 1984 to the present, including without limitation:

1. Listing of accounts, notes and other obligations payable to and receivable from such persons or entities;

2. Liability insurance policies relating to any director or officer of Texaco in his capacity as such.

### Category VIII.

For the period from January 1, 1983 to the present, documents relating to:

1. The sale or transfer of Texaco's Port Arthur refinery;
2. The sale or transfer of Texaco Canada stock;
3. The sale or transfer of Louisiana timberland (approximately 112,000 acres);
4. Payments to lobbyists or persons acting in such capacity for Texaco or its affiliates before the legislatures, agencies or representatives of the United States of America or the states of Texas, Delaware or New York;
5. Payments to firms, consultants and individuals who have acted or are acting in the areas of public and media relations for or on behalf of Texaco or its affiliates in connection with (i) advertising relating to corporate or "image" purposes (as distinguished from advertising of products) (ii) this bankruptcy or (iii) *Pennzoil v. Texaco Inc.* presently pending in the Texas Supreme Court, Cause No. C–6432;
6. Transactions or communications with Mr. Kurt Wulff formerly of Donaldson, Lufkin & Jenrette;
7. Texaco's post-petition payments in excess of $50,000 to persons or entities in discharge of pre-petition indebtedness not heretofore specifically approved by the bankruptcy court;
8. Purchase or renewal of director and officer insurance;
9. Payments by affiliates of Texaco in excess of $50,000 to persons or entities in discharge of pre-petition indebtedness of Texaco.

### Category IX.

Documents relating to the development, preparation or content of restructuring of Texaco's operations or a plan of reorganization for Texaco, including without limitation:

1. Any possible or proposed plans for reorganization whether or not currently under consideration;
2. Any supporting Business Plan whether or not currently under consideration;
3. Liquidation Analyses whether or not currently under consideration;
4. Business plans;
5. Texaco presentations regarding reorganization or restructuring of Texaco made to shareholders, employees or directors from November 1, 1985 to the present (including audio or video tapes of such presentations, *e.g.* Texaco Video News Service).
6. Valuation of stock of Texaco subsidiaries.

### Category X.

Documents prepared from and after January 1, 1984, relating to the value in connection with a corporate restructuring or reorganization, market value, fair market value, appraised value, sales value or liquidation value of Texaco's component parts and Texaco as a whole, including without limitation:

1. Preliminary, draft and final reports, appraisals or analyses prepared by investment bankers, investment advisors or appraisers;
2. Preliminary, draft and final reports, appraisals or analyses prepared by the financial staff, planning staff or Treasury department of Texaco or its subsidiaries or affiliates.